Filed 12/17/13  P. v. Davidson CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>PETER KENT DAVIDSON,<br><br>　　　Defendant and Appellant. | A134788<br><br>(Sonoma County<br>Super. Ct. No. SCR574451) |

Defendant Peter Kent Davidson ran a company that installed residential solar systems.  After being charged with numerous crimes related to his handling of the business, he pleaded no contest to one count of first degree burglary (Pen. Code,[1] § 459), three counts of diverting deposits (§ 484b), and five counts of elder theft (§ 368, subd. (d)).  He also admitted an in-excess of $200,000 loss enhancement (§ 12022.6, subd. (a)(2)).  He appeals from the restitution order, challenging the amounts he has been ordered to pay to two of the numerous victims.  The People have taken the position a limited remand is appropriate as to one of the two restitution amounts.  After reviewing the entirety of the record in the protracted restitution proceedings in this case, we conclude no remand is necessary.  We affirm one of the two challenged restitution amounts in its entirety, and affirm the other restitution amount in part and reverse in part.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

1

## FACTUAL AND PROCEDURAL BACKGROUND

From May 2008 through February 2009, defendant operated a company called American Sun Solar, which purported to sell and install residential solar systems.[2] Among other acts of malfeasance, defendant's company failed to complete installations, misused payments from customers, and failed to provide refunds for incomplete installations. Defendant was eventually charged with two counts of first degree burglary (Pen. Code, § 459), 15 counts of diversion of a deposit (Pen. Code, § 484b), five counts of theft from an elder (Pen. Code, § 368, subd. (d)), and misdemeanor counts of failing to obtain workers' compensation insurance (Lab. Code, § 3700.5) and contracting without a license (Bus. & Prof. Code, § 7028, subd. (a)). An enhancement for loss or damage greater than $200,000 was also alleged (Pen. Code, § 12022.6, subd. (a)(2)).

In October 2010, pursuant to a negotiated disposition, defendant pleaded no contest to one count of first degree burglary, three counts of diversion of a deposit, and five counts of elder theft, and admitted the loss enhancement. The remaining counts were dismissed with *Harvey* waivers.[3] Defendant stipulated to $153,000 in restitution as a threshold amount, with additional restitution reserved.

About six months later, on May 2, 2011, the trial court denied probation and sentenced defendant to the maximum term contemplated by the negotiated disposition of ten years in state prison.[4] The court awarded restitution in the amount of $195,456.54, noting defendant had stipulated to $153,000, and reserved as to further restitution.

---

[2] Because defendant's conviction was based on a no contest plea, the facts are taken from the probation report.

[3] *People v. Harvey* (1979) 25 Cal.3d 754, 758 (*Harvey*).

[4] The trial court explained its sentencing choice as follows: "You have some favorable factors under California Rule of Court[, rule] 4.414 in that you completed three grants of felony probation successfully. However, the unfavorable factors substantially outweigh the favorable factors, in particular this is an extremely serious matter. You've stolen close to $200,000 from people, and there is a stipulated agreement to [$]150,00, but appears that the sum is at least [$]200,000. The scheme that you carried out shows extensive planning, sophistication. You created a convoluted mess of employees, fraudulent contracts, fraudulent licenses. You had wound in with all that an extensive

On May 31, the prosecutor gave notice of a hearing on June 3 to modify "the existing restitution order to specify each victim and the amount owed to each." After two continuances, the first of numerous restitution hearings was held August 3. At that time, the prosecutor submitted a document entitled "Distribution of Restitution to Victims" listing 15 victims who requested restitution and the amounts claimed. The prosecutor explained the prior restitution order, specifying payment through the Department of Corrections (CDC), would not insure that the victims received full restitution, and the court needed to order an amount per victim. The prosecutor also stated the amount actually sought by the victims was $192,457.04, several thousand dollars less than the court had previously ordered. Defendant then objected to a number of the amounts sought. The court issued a revised restitution order for $192,457.04 and set the matter for a further hearing so defendant could contest particular amounts owed.

At the October 12 hearing, defendant agreed to all of the restitution amounts, except the amounts ordered as to Robert Truax ($15,700) and Eldon and Marian Killian ($8,212).[5] Defense counsel stated attempts to subpoena these individuals had not been successful, and counsel requested, and was granted, a continuance to obtain and review documentation pertinent to these two claims. The prosecutor, in turn, advised the court the revised restitution amount that had been ordered at the last hearing was again in error, and stated the total restitution listed on the "Distribution of Restitution to Victims" was

history of substance abuse, and it appears you were taking drugs during the time this was all going on. You also have self reported indebtedness of over $1 million or about $1 million. . . . I'm not even sure you could follow what you setup. You know, you have multiple victims, you have false licenses, you have multiple equipment purchases . . . And when you look at that picture that you created with these people and look at your history, you are—you know, you have seven prior felonies, several of which are similar to this one, and you have also performed poorly on a number of grants of probation." The trial court also later observed it was "particularly offensive" that you "represented yourself in certain circumstances to be a Reverend, and in light of how you tried to suck people in to do—to get contracts and so forth, that was also extremely offensive and manipulative."

[5] At times the parties and court state the amount as $8,202, which appears to be incorrect.

actually $162,425.50.  The trial court revised the restitution ordered to be for that amount, "payable to the victims as set forth in the Distribution of Restitution to the Victims Order filed 8/3/11."

At the continued hearing on November 10, the court began by summarizing the status of restitution: the total amount of restitution ordered was then $162,425.50, and two claims remained contested, that made by Truax ($15,700) and by the Killians ($8,212).  Instead of directing his comments to these two restitution amounts, defendant, speaking on his own behalf, commenced with a discourse about issues with his appointed counsel—stating he might need to bring a *Marsden*[6] motion, his desire for an accounting of restitution he had paid to date, and his desire to cross-examine Truax and the Killians.

Defendant then provided copies of three checks written by Truax to the solar company and deposited into West America Bank, a bank defendant claimed to have no relationship with, and which were deposited into and dispersed from an account he claimed to have no control over.  Other people in the company, according to defendant, controlled and managed those funds.  Defendant asserted he was not an officer of the company, only the general manager.  Defendant also stated Traux's solar system had been fully installed.  The prosecutor responded there were problems with the installation and Truax had to hire a licensed contractor to make the system functional.  She explained the $15,700 sought by Truax was for the amount of a materials lien that had been placed on his property ($15,000) and the amount he had to pay the contractor to make the system operable ($700).  Defendant continued to claim he did not owe restitution to Truax and asserted his business records would show that.

Defendant also claimed the Killians received a functional system for the original contract price and thus had not been damaged.  Defendant acknowledged receiving an initial payment from the Killians and claimed he used those funds to pay material costs and company bills.  He also asserted another contractor (and former employee), Don

---

[6]  *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

4

Barch, completed the Killian's system for the balance of the contract price. Accordingly, the Killians did not suffer any loss.

The prosecutor explained the Killians' restitution claim for $8,212 consisted of the fee they had paid an attorney to help them ($450) and the initial amount they had provided to defendant for installation of the system ($7,762). The prosecutor's theory was that the Killians "had to hire" Barch "to do the installation," and that they had paid defendant "over $7000 for no services." The "$7,000 went nowhere except to [defendant]." "[I]t's the People's position, and I think the case law supports this, that [defendant] should not get a windfall of over $7,000 because another contractor came in and gratuitously assisted [the Killians] in trying to get this" job done. The prosecutor maintained a "prima facie" claim for restitution had been made, and it was up to defendant to rebut it.

The court concluded defendant had raised some legitimate questions and wanted to know the answers. The hearing came to a close with defendant requesting his files returned to him, claiming he had delivered three boxes to the public defender's office. Defense counsel, who had largely not participated in the hearing, stated her office had received two boxes and had already returned one. She also stated defendant's inability to view the material in an unredacted fashion and inability to have prolonged visits with counsel (due to his incarceration) would make it burdensome to provide defendant with the records and difficult to arrange a meaningful opportunity for joint review. Ultimately, the court asked that the Truax and Killian files be delivered to it so it could review the two claims. At that point, defendant, again speaking for himself, said he had focused on these two claims because he "remembered" them, intimating he might have issues with other claims. The court nipped this meandering in the bud, stating he had stipulated to the other amounts, and only the Truax and Killian claims were at issue.

On December 8, the court advised the parties it had received the box of documents, had briefly looked at them and was concerned that some appeared to be attorney-client privileged materials. Defendant, again speaking for himself, stated the files he wanted the court to review were not in the box, but elsewhere. The court

5

continued the hearing so he could have them delivered.  The court also asked defendant to prepare an offer of proof or a letter explaining his objections to the Truax and Killian restitution claims.  Defendant, in turn, asked that the victims be subpoenaed.  The court refused, stating it wanted to review defendant's offer of proof before exploring that option.

At the next hearing, on December 23, defendant, speaking for himself, began by complaining about his attorney and saying he wanted to make a *Marsden* motion.  The court stated, "I'm not granting it for a restitution hearing," and wanted to know whether defendant had prepared the requested offer of proof or letter explaining his challenge to the two restitution claims.  At this juncture, the court was concerned defendant was "just stalling."  Defendant responded he had a "right" to a restitution hearing where he could question witnesses.  The judge disagreed, explaining he was "not entitled to cross-examine witnesses in a restitution hearing, unless I grant it."

At this point, the public defender appearing that day, Karen Silver, stated defense counsel who had been handling the case, Judy Conry, "also knew we can't bring victims in here," and Silver requested that the court set the case for a *Marsden* motion.  The court responded:  "[I]t would really help us out if she [Conry] would return his phone calls.  He has been complaining about this for months.  I have tried to smooth this over, but I'm not a miracle-worker.  Please, I mean, somebody call this man back so he can do what he needs to do."  The prosecutor then joined in the request for a *Marsden* hearing, and the court continued the case for motion setting.

On January 26, 2012, a different judge heard and denied defendant's *Marsden* motion, and returned the case to the judge who had been handling the extended restitution hearings.

The next restitution hearing took place on February 15.  Deputy District Attorney Amy Ariyoshi substituted for the prosecutor who had been handling the case, Robin Hammond.  The parties agreed to reduce the restitution award to the Killians to $450 (the amount the Killians had paid an attorney for advice).  Ariyoshi also stated there appeared to be no dispute as to $700 of the Truax claim (the amount Truax paid to the contractor,

6

Barch, to get the system up to code), and defendant did not disagree. Continuing to speak for himself, defendant reiterated his disagreement with the $15,000 Truax was claiming for the materials lien. Defendant asserted he had subpoenaed a Mr. Hoffman who failed to appear, and wanted additional time to obtain a bank signature card he claimed was relevant.

Defendant also presented the written document the court had wanted spelling out his objections to the two restitution claims. Upon determining defense counsel had not seen it, the court directed defendant to give it to his attorney, who said she was "unclear as to what the goal is for this." The court reiterated defendant should give it to "Ms. Conry, that Ms. Conry read it, and submit it to my judicial assistant if you deem it's appropriate, and I would prefer that you do that before the weekend, so that I could read it over the weekend." Defendant made no objection; instead, saying, "Cool." Defendant then asked for a copy of the document. The court said it would make one for defendant *and* one each for defense counsel and the prosecutor. Defendant made no objection. The prosecutor then volunteered to make the copies. The court said, "fine." At this point, defendant objected to the "D.A. looking at it until my attorney's had" and the prosecutor said she would have defense counsel make the copy and would "not look at it."

At the next hearing, on February 22, defendant's attorney, Ms. Conry, was again in trial and another deputy public defender, Andrew Thomas, appeared. At the outset of the hearing, the prosecutor, Ms. Hammond, explained she had been ill at the last hearing and objected to the stipulation that had been reached as to the Killians, asserting they had "actually lost" over $8,000 and therefore the lesser stipulated amount rendered the "sentence invalid." Hammond said, however, that the people were prepared to "submit" on that issue. Mr. Thomas responded he was "in a bit of a disadvantage" because he had been "summoned at the eleventh hour to appear" in place of Ms. Conry and was "really not familiar with all the facts of the case." The court then stated it had wanted to review defendant's written explanation of his challenge to the two restitution claims, and thought copies had been made for all counsel. Mr. Thomas replied the court would have to put the case over because "I don't know the facts of this case." The court then asked if

7

someone could "at least get the file," and Thomas replied he would "make my best effort."

At this point, defendant interjected, "I'm going to tell Mr. Thomas that he's going to allow me to speak right now, so that I can get this over with. I've been here, and your office has just been playing me along." He complained nothing had changed since the *Marsden* hearing, and that Ms. Conry failed to keep appointments and spoke to him disrespectfully. "It's beyond—I mean if you were in my place, you would want a conflicts attorney. I want representation. I never have gotten it, one hour, on 24 counts." The court responded that was why she was asking Mr. Thomas to get the file. Defendant then agreed he should "[go] get it."

When Thomas returned, the court stated, "we've got a problem here," recounted there had been two *Marsden* hearings, and the court needed "someone to help this guy to get this over with." Noting defendant was being housed in the county jail because of the repeated continuances, it wanted "to have a discussion about it today" to "see if we can figure this out." The court said it still did not understand why defendant was disputing the Truax and Killian claims, and stated if there was another *Marsden* hearing and it had to appoint new counsel "that would be a travesty . . . because we're almost at the end of this case." Somebody, said the court, "just needs to follow through with it." The court also did not think Ms. Conry, "at this point, truly knows any more about the specific things than you [Mr. Thomas] do."

Thomas responded "I never heard of [defendant] until an hour ago," when he was approached by office staff and told Conry was in trial and had a "restitution issue that needs to be submitted," and asked whether he could "go up and say the word 'submitted.' " At this point, defendant, speaking for himself, refused to submit on the written document he had prepared, stating he had a "right to an attorney looking at it."

The parties, including defendant still speaking for himself, then commenced discussing the two restitution claims at issue. Defendant made no objection to going forward, and repeated his view that the Killians were not out of pocket any money because they received a workable solar system for the contract price. The prosecutor

then reiterated defendant's contention he was not liable for what Truax had paid to remove the materials lien because he had no control over the monies Truax had paid. The prosecutor asserted this was irrelevant because defendant had pleaded with a *Tahl* waiver[7] as to all counts, including that involving Truax.

At this juncture, Mr. Thomas again objected to proceeding, explaining the court file included "an entire box with assorted files in it." The court stated it had gone through these files because Ms. Conry "didn't wish to" and determined there was nothing relevant. Defendant immediately disagreed, whereupon Mr. Thomas, acknowledging the court's frustration, stated "I cannot possibly appropriately represent this gentleman at this proceeding." The court then asked if counsel could possibly help move the matter forward and at least identify specifically what needed to be done. Mr. Thomas agreed to try to help. Defendant made no objection.

Defendant, speaking for himself, then re-explained his position as to the Killians' claim, not disputing the $450 they had paid an attorney. As he saw it, the Killians got the solar system they purchased for the price they agreed to pay and therefore suffered no loss. The Killians paid him the initial amount and paid the balance of the contract price to Barch, who had previously worked for defendant and who completed the installation. Defendant also stated the Killians had received a $4,123 rebate, which they had assigned to the company and which had been credited against the contract price and ultimately paid to Barch.

The prosecutor responded Barch had told the investigators he had done a few installations for defendant's company and defendant's installers didn't know what they were doing. Barch said he met with defendant in January 2008, and defendant "signed a release for releasing [the company's] contracts on several projects. My goal is to complete the solar installations on project and make the home owners whole." Barch "worked [with the homeowners] to get their systems running right and to get their rebate paperwork filed." He also claimed defendant told him the "the presite visit charge [part

---

[7] *In re Tahl* (1969) 1 Cal.3d 122 (*Tahl*).

9

of the initial payment] was where all the profit was." The prosecutor described Barch as a "good Samaritan" who was "not paid" for completing the work, and who "would have a right to subrogation once the victims are compensated." The Killians, then, according to the prosecutor, "should certainly be awarded victim restitution for what happened in this case."

Defendant disputed that Barch wasn't paid. Rather, Barch got exactly what he had always been slated to get under the contract for the installation, the $4,123 rebate amount. The court then observed that had Barch done the job from the outset, he also would have received the initial $7,762 the Killians had paid to defendant, and therefore defendant apparently got a "windfall." Defendant reiterated that he wanted to call Barch as a witness, as well as Hoffman. When asked by the court if there was anything else he wanted to add, defendant replied: "not without having a competent attorney that knows about the case."

As for the Truax restitution claim, defendant first complained he had not realized he had pled no contest to a charge that he had committed burglary as to Truax and had not realized he had pled to a strikeable offense. Turning his attention to restitution, he challenged the $700 Truax paid to Barch to move the solar system on the ground the relocation was wholly unnecessary. The prosecutor said the investigator reported the $700 was paid to Barch to bring the system up to code.

As to the $15,000 Truax sought for releasing the materials lien, defendant, still speaking for himself, "agree[d] that he should get that money back." The prosecutor then read from the investigator's report that Truax actually paid only $2,026.40 toward the lien, with other payments coming from the "the rebate check." At this point, defendant again complained that he had not been able to call witnesses, and he wanted "proof of payment" of the amount claimed for releasing the materials lien. However, when asked by the court, defendant agreed he would pay Truax as restitution for the lien, the difference between the lien amount ($15,000) and the rebate credited towards the lien ($6,738), or $8,262. This concession was made with continued protestations he was not personally responsible. Nevertheless, said defendant, "I will agree to pay that money

10

back to that customer because the people who were running the company at that time threw their hands up." At this point, the prosecutor agreed the rebate money had gone towards satisfying the lien, and made only a passing attempt to object to crediting the rebate and then "submitted" on the issue. The court then stated $8,362[8] was owed Truax for removal of the materials lien.

Turning back to the $700 Truax had paid to Barch, the court asked defendant whether he "was submitting on that matter." Defendant responded "that because the Truaxes had to go through this challenge, and the final, the way the thing finally came together, and they got approached, and all that stuff from PG&E, I would agree to pay that money." He continued to maintain he wasn't "responsible to pay it," but asserted he felt "morally responsible to pay it." The court then ordered that $9,062 be paid in restitution to Truax ($8,362 for the lien removal and $700 for the amount paid to Barch). Defendant made no objection. Nor did he disagree when the court stated "that takes care of [the] Truaxes."

The court then returned to the Killians' claim. As he had indicated earlier in the hearing, defendant, continuing to speak for himself, again did not object to the $450 they paid to an attorney. He did, however, continue to object to any additional restitution on the ground the Killians had received a functioning solar system for the price they had agreed to pay and thus had not suffered any loss. After the prosecutor submitted, the court asked defendant if he also submitted. Defendant responded by asking about his written submission, which he said his attorney was to review. When the court asked Mr. Thomas if he had had sufficient time to speak with defendant about it, he (Mr. Thomas) replied he had spoken with defendant and understood defendant was "not going to be submitting" the document. Mr. Thomas also advised he did not believe defendant had anything further than what he (defendant) had orally presented at the hearing. He additionally stated defendant wanted a continuance to further confer with Ms. Conry.

---

[8] At other times, the trial court used the $8,262 figure.

11

Defendant, again speaking for himself, next complained the document he had prepared at the court's request had been forwarded to the prosecution before being reviewed by counsel. He claimed he was supposed to meet with Ms. Conry, but she did not "show up." He wanted to meet with her again to go over the "front six inches" of files in the box, claiming he needed an attorney that was "intimately aware of my case." When the court inquired what additional information there was pertaining to the Killians' claim, defendant began to complain he had been limited to addressing only the two restitution claims. He acknowledged the court "at least understood what was going on" as to the Truax claim, but asserted for the same or similar reasons (related to rebates) "there's others that can be discussed." The court reiterated defendant had stipulated as to those claims, and only the Traux and Killian claims were at issue. Defendant then launched into a discourse on the need to have the attorney who knew about his "tactics," and claimed there "is a point to all of this" that Ms. Conry "is aware of," and that she was not there "to allow us to do that." He complained "[w]hat we did today kind of got pulled out of me," but then said, "that's okay." He then stated he wanted "the final thing with Judy Conry here on the record."

The court reiterated defendant had submitted as to the Truax claim, and defendant did not disagree. As to how Ms. Conry's presence would bear on the Killians' claim, defendant repeated his desire to call Hoffman as a witness. The court then stated it intended to order $4,089 in restitution for the Killians—$450 for the attorney fees plus $3,639 (representing the $7,762 payment they made to defendant, less the $4,123 rebate they received).

Defendant continued to object on the ground he wanted to submit his written document after review by Ms. Conry and he wanted to call Hoffman as a witness. The court then turned to Mr. Thomas and asked how either would make any difference. He responded that based on his discussion with defendant, he could not tell the court it would make any difference. Defendant immediately accused Thomas of "having to say that to protect his [the public defender's] office" and again claimed his rights had been violated by Ms. Conry's apparent disclosure of his written document to the prosecutor. The

12

prosecutor immediately responded she had not utilized anything from the document. The court, in turn, asked defendant how he had been prejudiced by the disclosure, and also stated it felt the hearing, while long, had been very productive. Defendant agreed. The court then asked defendant what Hoffman would testify to. Defendant made generalized assertions Hoffman's testimony would make things "clear" as to the "contracts" and Barch's completion of the work, and again stated that, other than the attorney fee, he did not owe the Killians anything.

The rest of the hearing was spent attempting to add up all the restitution items owed. Ultimately, the court concluded the estimated restitution total from October 2011—lowered to $162,425.50 from $192,457.04—had been reached by arithmetic error, and found the specific victim amounts, as modified, totaled $181,696.04. The hearing closed with Mr. Thomas stating he would file a notice of appeal for defendant as to the restitution order, and defendant complaining about "how poorly" Ms. Conry represented him in connection with the plea bargain and accusing her of being a "lousy attorney" who was "a surrogate prosecutor."

## DISCUSSION

We have recited the saga of the restitution hearings in this case in detail because it shows that neither defendant, nor the Attorney General, is entirely correct in his and her assessment of the restitution order. Indeed, our review of the entirety of the restitution record leads inevitably, in our view, to two conclusions which do not require extensive discussion.

### *The Truax Restitution Claim*

While defendant contends on appeal that he was deprived on his right to competent representation, requiring reversal of the restitution order as to both Truax and the Killians, in our view that is not a fair characterization of what transpired during these unusually protracted restitution proceedings. Frankly, defendant's principal attorney said next to nothing during the proceedings and defendant did not hesitate to speak for himself. He clearly and forcefully made his case to the trial court—*repeatedly*. This held true at the last hearing, as well, when Mr. Thomas appeared for defendant's usual

13

attorney, Ms. Conry. While Thomas, at the outset of the hearing, expressed doubt as to his ability to represent defendant, defendant did not then ask that the proceedings be continued. On the contrary, he made it abundantly clear he was totally frustrated at how long the restitution proceedings were taking, agreed Thomas should retrieve the file so the court could proceed, and then, speaking on his own behalf, proceeded to address at length the two restitution claims at issue.

By the time defendant discussed the Truax restitution claim, in particular, there was not the faintest suggestion he felt, or was suffering from, any deprivation of competent representation. On the contrary, defendant had acceded to Mr. Thomas' acquisition of the court file, had acceded to moving forward with the hearing, and had ably made his case about the Truax claim. The trial court then agreed to *substantially* reduce the restitution it had previously awarded ($15,700) to $9,062. And defendant expressly and unequivocally *agreed* to pay that amount. In short, whatever concern defendant might have had about Mr. Thomas standing in for Ms. Conry was long set aside by the time defendant got to the meat of the Truax claim. And any concern Mr. Thomas had about his lack of familiarity of the case had absolutely no bearing on the discussion and resolution of the Truax claim. Indeed, there is not the faintest suggestion from anything in this record that the outcome on the Truax claim could possibly have been any more favorable to defendant than it was.

Defendant's assertion, at the end of the hearing, that he wanted Ms. Conry present for "the final thing . . . on the record" has no impact on the disposition of the Truax claim. Read in context, defendant's belatedly professed desire to have Conry present (despite having repeatedly criticized her throughout the hearings) pertained to his continuing dispute over the Killians' claim, which the trial court had not resolved to his satisfaction, in *contrast* to the Truax claim. Indeed, only moments before summoning up Conry's name, defendant agreed the trial court "at least understood what was going on" as to the Truax claim. What defendant remained disgruntled about, and why he asked at the eleventh hour for Conry, was to put off the final decision on the Killians' claim.

14

We thus conclude that as to Truax, defendant has no grounds to challenge the restitution award.

### The Killians' Restitution Claim

The restitution awarded to the Killians consisted of two amounts: $450 (what they paid to an attorney for advice) and $3,639 (the $7,762 initial payment they made to defendant, less the $4,123 rebate).

As to the $450, the record makes clear defendant *never* took issue with that part of the Killians' claim. Moreover, at the hearing on February 15, 2012, at which his usual counsel, Ms. Conry was present, defendant stipulated to restitution in that amount. Defendant never disavowed that stipulation, and at the final hearing, continued to agree that was a proper item of restitution. Accordingly, defendant has no basis for challenging that part of the Killians' restitution award.

Rather, defendant's challenge to the Killians' restitution claim, all along, has been to the $7,762, the initial amount paid for the solar system. As discussed above, this is the claim as to which defendant purported to want Ms. Conry present. However, we need not, and do not, decide whether defendant was denied adequate representation in connection with that claim, requiring reversal and remand. We conclude there is a more fundamental problem with this aspect of the Killians' restitution claim, namely there is no evidence the Killians were damaged in this amount. (See generally *People v. Busser* (2010) 186 Cal.App.4th 1503, 1508–1510 (*Busser*) [restitution is proper only where victim suffers actual economic loss].)

The Killians, unlike others, received a functioning solar system, for the price they had agreed to pay. In short, they got the benefit of their bargain. The prosecutor never disputed this. Instead, her argument eventually focused on the fact defendant received the initial amount ($7,762), but another contractor, Barcher, actually installed the system. But the fact defendant may have failed to pull his weight in getting the installation completed—vis-à-vis Barcher—does not entitle the *Killians* to restitution. Nor does the fact Barcher might theoretically be able to sue the Killians for the full value of his work entitle them to restitution. There is not a shred of evidence suggesting Barcher

15

contemplates seeking any amount from the Killians. Thus, any such damage is pure speculation. The trial court appeared to base this restitution amount on its perception Barcher was rightfully entitled to the $7,762, not defendant. But even if that were true, it does not mean the *Killians* can recover this sum. Furthermore, defendant testified without contradiction that Barcher was, in fact, paid the amount for which he had previously agreed to do the job, namely the $4,123 rebate amount, which the Killians in their contract signed over to the company in exchange for a credit against the purchase price.

In sum, we agree with defendant the evidence does not show the Killians paid any more for their solar system than what they agreed to pay for it under the contract and, therefore, they are not entitled to restitution of the initial amount they paid to defendant, rather than to someone else in the company. (See *Busser, supra,* 186 Cal.App.4th at pp. 1509–1510 [because insurance company was required under policy to pay repair costs, defendant's criminal misrepresentations did not entitle insurer to restitution of those amounts].) We therefore order $3,639 (the $7,762 initial amount they paid to defendant, less the $4,123 rebate) stricken from the restitution order as to the Killians.[9]

### Total Restitution

In light of our rulings as to the Truax and Killian claims, the total restitution awarded is $178,057.04. That number is reached whether one subtracts $3,639—the amount erroneously awarded to the Killians—from the trial court's final, total restitution award of $181,626.04; or whether the final awards as to Truax ($9,062) and the Killians ($450) pursuant to the reductions as to Truax and Killians ordered by the trial court and the further reduction as to the Killians we have ordered, are added to the amounts listed in the August 3, 2011, Distribution of Restitution to Victims statement and ordered as to *other* claimants (totaling $168,545.04).

---

[9] Given our conclusion in this regard, we need not, and do not, address, defendant's argument that the prosecution could not withdraw its stipulation as to the Killians' restitution made at the February 15 hearing.

16

Defendant contends the total restitution award cannot exceed $162,425.50, the figure the prosecutor requested, and the court ordered, at the October 2011 hearing. The salient point, however, is that at that October hearing, defendant expressly stipulated to the amounts enumerated in the Distribution of Restitution to Victims statement for *each victim*, except Truax and the Killians. Accordingly, as the trial court repeatedly made clear, only the amounts owed Truax and the Killians were at issue, and the restitution amounts listed in the written statement and ordered as to all the other victims was not.

On careful examination of the record, it is apparent the prosecutor simply made a mistake at the October hearing in stating the amounts listed in the Distribution of Restitution to Victims statement (including those made by Truax and the Killians) totaled $162,425.50. Specifically, it is apparent the prosecutor skipped over the restitution claim of the second-listed victim, in the amount of $30,031.54. When that amount is included, the restitution claims enumerated in the statement total $192,457.04, as the court ordered at the previous hearing. In any case, given defendant's stipulation as to the *individual* restitution claims, other than those of Truax and the Killians, he cannot take advantage of an arithmetic error to lessen his admitted restitution burden.

### DISPOSITION

The restitution ordered as to the Killians is reduced to $450, and the Abstract of Judgment is to be corrected accordingly. The restitution ordered as to Truax is affirmed.

_____
Banke, J.

We concur:


_____
Margulies, Acting P. J.


_____
Dondero, J.

17